528 So.2d 1043 (1988)
David EGUDIN
v.
CARRIAGE COURT CONDOMINIUM, DEHRVILL GROUP, INC., Pierre G. Villere, The Pierre Villere Companies and Vilmark Brokers, Inc.
No. 88-CA-69.
Court of Appeal of Louisiana, Fifth Circuit.
June 7, 1988.
*1044 Leonard Levenson, New Orleans, for plaintiff-appellee.
John E. Seago, Baton Rouge, for defendants-appellants.
Joseph F. D'Aquin, III, Metairie, for defendant-appellee Christopher E. Lawler.
Before CHEHARDY, GRISBAUM and DUFRESNE, JJ.
DUFRESNE, Judge.
This is an action for specific performance and damages arising out of the failure of a seller of a condominium unit to deliver title to the buyer. The trial court found that the seller had committed fraud, and had violated La.R.S. 51:1401, et seq., the "Unfair Trade Practices" act. He further found that the two real estate agents who handled the sale breached their duties to the buyer. Judgment was thus rendered in favor of the buyer for damages and attorney fees. Because we find no reversible error in this judgment, we affirm.
The events leading to this suit began in 1981. David Egudin, plaintiff, is fluent in Spanish and English, and met Ann Zehentner, a real estate agent and defendant here, while acting as an interpreter for Spanish speaking clients of hers. Through this association, Egudin became interested in a condominium unit in Carriage Court Condominiums, a development being handled by Zehentner's firm, Vilmark Brokers, Inc. Vilmark had been incorporated by Pierre Villere, another defendant, who was also a stockholder in this corporation. The sponsoring broker of the corporation was Bobbie Henderson, also a defendant. Villere was, in addition, president and major (if not sole) stockholder in Behrvil Group, Inc., which in turn was the general partner of Carriage Court Condominiums, a Louisiana Partnership in Commendam, the developer of the Carriage Court project. Both of these entities are additional defendants here.
On December 21, 1981, Egudin executed a unit preference and reservation agreement and deposited $200 with Zehentner, for Unit 202 at Carriage Court. In February, 1982, a purchase agreement for the unit was executed, and Egudin tendered a deposit of 10% of the purchase price. These funds were placed in Vilmark's escrow account as specified in the agreement.
Two months later, a second purchase agreement was drawn up. Under the terms of this agreement, Egudin was to "deposit with Seller cash in the amount of $45,609.50". Egudin's deposit under the February agreement was returned to him, and he then paid over to Carriage Court the second "deposit", which was in fact the price of the unit, plus some $10,000 for renovations. All of these funds were placed by Villere in the operating account of Carriage Court.
The evidence further showed that Bobbie Henderson was the agent who actually handled the signing of the second agreement and received the funds on behalf of Carriage Court. The agreement itself further provided that the act of sale was to take place not later than June 1, 1982. The explanation for this delay was that a certain percentage of the units had to be under contracts of sale before the mortgage holder would release those properties from the mortgage. Additionally, the testimony was to the effect that Carriage Court did complete renovation of the unit for Egudin at a cost of some $10,000, and he was permitted to move into the unit rent free after the work was completed, but before the final closing.
By August 17, 1982, no closing had taken place, and on that date Egudin, at the request of Zehentner, signed an extension of the closing date to December 15, 1982. In early December, Egudin phoned Zehentner to ask about the closing. Zehentner called back and advised Egudin that the developer wanted to wait until after the first of the year to close for tax purposes.
*1045 He apparently did not then voice any objection. However, later in December he went to a condominium association meeting, and when roll was called, Villere's name was given as owner of Unit 202.
Upon learning that his unit was not in fact in his name, Egudin demanded to speak to Villere. Zehentner assured him that everything would be all right and urged him not to worry. Egudin stated that he nonetheless attempted to contact Villere and made perhaps one hundred phone calls to Villere's office over the next two months. Although he did not reach Villere during this period, he was repeatedly assured by a Mr. Billiot of that office that he would receive title. After threatening to make a scandal at the Carriage Court sales office, Egudin was finally provided with a document, dated March 22, 1983, and styled "Acknowledgement of Title". The substance of this document is that it acknowledged that an Agreement of Sale and Purchase was entered into by the parties, that Egudin had paid the consideration called for in that agreement, and that the act of sale was unavoidably delayed. It further stated that Egudin had "a right to beneficial interest in said property, entitled to benefits of possession and custody thereof", as well as being "entitled to conveyance" as per the Agreement of Sale and Purchase. The document was delivered to Egudin by tacking it to his door.
While initially put at ease by this document, Egudin soon had second thoughts. He consulted the district attorney who referred him to the consumer protection division of the sheriff's office, who in turn advised him to check the conveyance office and consult an attorney. He went to the conveyance office where he was befriended by Mr. Compton, an abstractor. Compton advised him to record the "Acknowledgement" (which had not been done by Villere's office), and further discovered that the property was subject to a prior mortgage which would have to be removed before any sale could take place.
Egudin finally arranged to meet with Villere personally, with Zehentner present. Villere assured him that he would get title to the property, and further told him that the money for the deposit was in some federal bank. When asked which bank, Villere remained silent. Zehentner also gave assurances that everything would work out. In a follow up letter of April 13, 1983, Villere wrote: "let me give you my personal assurance that we will make every effort to bring you to a prompt closing" (emphasis added).
After this meeting, Egudin heard rumors that the project was in trouble and would have to be refinanced, and further that there might be a foreclosure. Another meeting was arranged where only Egudin and Villere were present. Egudin asked for return of his money, but was told that it couldn't be done. He then insisted that Villere give him his personal guarantee that he would get title. In a second follow up letter, dated May 26, 1983, Villere wrote: "As we discussed, I will have the attorneys prepare a document giving you my personal guarantee that I will tender title to you of your unit at Carriage Court regardless of what events might occur in the future" (emphasis added).
The next, and last, conversation that Egudin had with Villere was several weeks later, by phone. Villere initiated the call, and told Egudin that the bank had called him a number of times about the "Acknowledgement of Title" and stated that he needed to know the COB number where it was recorded. Egudin provided the information, but was not told why Villere needed it. A few days after this conversation, Zehentner appeared at Egudin's unit with a document provided her by Villere, which was in fact an authorization for cancellation of the inscription of the Acknowledgement of Title. Apparently realizing that were the inscription cancelled, Egudin's legal position would be weakened, Zehentner advised him not to sign it and to seek legal counsel. This meeting occurred in the late summer of 1983.
In the meanwhile, other pertinent events were occurring. The record shows that between June and December of 1982, the period of the extension agreed to by Egudin for the closing, several other units at *1046 Carriage Court did go to acts of sale. Although the trial judge made no express factual findings on this issue, the evidence is clear that these units were closing because the buyers were financing them. Thus, the purchase prices were being paid directly by the lenders to the first mortgage holder, which in turn was releasing the units from the mortgage, and permitting the lenders to perfect their own first mortgages. It is equally evident that the reason the Egudin sale could never go to closing was because Villere had used Egudin's deposit for operating expenses, and Carriage Court simply had no other funds to pay over to the mortgagee to obtain release of the unit.
There was further testimony which showed that by the spring of 1983, Carriage Court was in financial trouble and was attempting to refinance its loans with Audubon Federal Savings and Loan Association. Villere testifed that there were discussions about the status of unit 202, and that he informed Audubon Federal that the unit had been sold and should not appear on the new mortgage note. Nonetheless, it did appear, and on June 28, 1983, Villere signed all of the loan papers which re-encumbered that unit, along with all other unsold units at Carriage Court. This was one month after Villere had given his second personal guarantee to Egudin that title would be forthcoming.
It was further shown that in late 1983, Audubon Federal filed executory proceedings against Carriage Court for non-payment of the note renegotiated in June of that year, and proceeded against unit 202, as well as all other mortgaged property. Egudin, through his own resources, and with no direct assistance from Villere, obtained injunctive relief against the sale of his property. In subsequent developments, the FSLIC took over the affairs of Audubon Federal, and various federal court proceedings were commenced. At the time of trial of the present suit in July, 1987, title to Unit 202 had still not been transferred to Egudin, and the FSLIC was still asserting a $33,000 mortgage on the property. The parties have further represented in briefs before this court, that the federal action is now before the United States Court of Appeals.
In regard to the above legal proceedings, as well as the instant litigation, Egudin showed that he has spent over $10,000 for court costs, and his legal fees will total more than $27,000. It was also stipulated at trial that the FSLIC would cancel the mortgage on Unit 202, for payment of $33,000, and it was further admitted that Egudin is entitled to specific performance on the contract to purchase the unit. Finally, Egudin testified that his take home pay is only $200 per week, that his entire life savings are tied up in the condominium, and that the financial and emotional strain of this matter drove him to attempt suicide.
After hearing the evidence, the trial court found that the actions of Villere constituted fraud, as well as violation of the Unfair Trade Practices Act. He further found that Zehentner and Henderson breached their duties to Egudin in failing to escrow, or otherwise see to it that his funds were protected until an act of sale was concluded. Having so found, he ordered Villere and Carriage Court to conclude an act of sale for the unit, or in the alternative, pay him $33,000. He further awarded general damages of $200,000, attorney fees of $27,090.00, and all costs against all defendants, in solido.
Villere and Zehentner now appeal.
Villere asserts that the trial judge erred in piercing the corporate veil and finding him personally liable for fraud and unfair trade practices. Zehentner alleges error in the finding that she breached her fiduciary duty owing to plaintiff as a real estate agent. We disagree with both allegations.
The law as to the personal liability of officers, directors or shareholders of corporations is well stated in Lone Star Ind. v. American Chemical, 461 So.2d 1063 (La. App. 4th Cir.1984); 480 So.2d 730 (La.1986); 491 So.2d 1333 (La.1986). There it was noted that there are two general situations in which the corporate veil may be pierced. One is where the formalities of corporate existence are so far disregarded as to render its affairs indistinguishable from the *1047 affairs of the stockholder. The other, applicable here, is where an officer or shareholder commits fraud on a third party in the name of the corporation.
The essential question in regard to Villere is thus whether his acts were fraudulent. Fraud is defined in La.Civ.Code Art. 1953, as follows:
Fraud is a misrepresentation or a supression of the truths made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
Villere asserts that he acted in good faith at all times in protecting Egudin's interests, never sought an unjust advantage or intended that Egudin suffer a loss, and therefore committed no fraud. The facts are otherwise. Although it might reasonably be argued that originally placing Egudin's deposit in Carriage Court's operating account was not a fraudulent act, Villere's subsequent handling of this matter over the next sixteen months can only be characterized as a systematic attempt to postpone the final reckoning with this problem, all at Egudin's expense.
It is manifest from the evidence that Villere knew there was a problem with the closing as early as the fall of 1982. Other units were then going to closings, and Villere had to have known at that time why unit 202 could not close. His response was to ask Egudin to further extend the closing date until after the beginning of 1983, ostensibly for tax purposes. When Egudin finally demanded some documentation of his ownership of the unit (via some one hundred phone calls in two months) Villere responded by providing him with an "acknowledgement of title", which did nothing more than recite the terms of the agreement to purchase. However, Villere did not even see fit to record this instrument. When Egudin persisted in his efforts to obtain title, Villere met with him twice, and both times personally guaranteed that he would get title. Upon Egudin asking that the funds be returned, Villere told him the funds were in the bank, knowing full well that they were not. Just over a month after the second meeting, Villere re-encumbered the property with Audubon Federal, even though knowing full well that the by now long standing problem with the closing was Audubon's refusal to release it from the prior mortgage unless funds were provided to do so. Finally, in response to Audubon's insistence, Villere attempted to have Egudin cancel his recordation of the acknowledgement of title. While the efficacy of this document in transferring title was tenuous at best, it was nonetheless Egudin's one bit of leverage in the matter.
Villere urges here that regardless of these acts, because there was no advantage to him personally, no fraud was committed. This assertion is groundless. There was evidence that Villere drew substantial amounts of money out of Carriage Court during the time in question. Moreover, once he personally guaranteed title, it was incumbent upon him to find the funds to release the mortgage on the unit, or return them to Egudin. In this circumstance, there can be no question that Villere's delay in doing either was advantageous to him. Considering these circumstances, it is clear to this court, as it was to the trial judge, that fraud as defined in Civ.Code Art. 1953, was perpetrated in this case.
As to the Unfair Trade Practices Act, La.R.S. 51:1405, declares that
"Unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."
Again, the facts provide an ample basis for a finding that this act was violated.
As shown above, at least as early as the fall of 1982, Villere knew there was a problem. He undertook, nonetheless, a course of dealings with Egudin which were designed to mislead him, and delay his seeking legal redress, and having no end other than to permit Villere to delay having to confront the problem directly. These actions were clearly "unfair and deceptive", and the trial judge properly so found.
As to Zehentner, this court finds that there was ample evidence to show that she breached her fiduciary duty to Egudin. In Mallet v. Maggio, 503 So.2d 37 (La.App. *1048 1st Cir.1986), the court re-iterated the rule that a real estate broker stands in a fiduciary relationship to her client. It went on to observe that the broker's duties are those which are analogous to La.R.S. 37:1454 (now La.R.S. 37:1455), which statute provides grounds for revocation of a realtors license, as well as the customs and practices of real estate brokers in general.
In the present case, a threshold question is thus what were the customs and practices of real estate agents in general. Stated another way, the question is whether Zehentner acted with the degree of care and skill ordinarily exercised by brokers. cf. Boudreaux v. Panger, 490 So.2d 1083 (La. 1986).
Expert testimony was presented by Egudin to the effect that Zehentner's actions fell below this degree of care and skill. Specifically, Elizabeth Buchler, a real estate broker and member of the Louisiana Real Estate Commission, testified that under the applicable rules of the Louisiana real estate licensing law, Zehentner would have been required to escrow Egudin's deposit of the sale price. She further testified that in turning the funds over to the seller, her and Bobbie Henderson's action was contrary to established principles in the industry.
Zehentner argues to the contrary, that prior La.R.S. 37:1454(A)(4) [now 1455(A)(4)] permits a departure from the escrow requirement when all parties agree in writing to do so. While that is a correct statement of the law, it has no bearing on the facts before us. Egudin's testimony, which the trial judge believed, was that neither Zehentner nor Henderson explained to him that in paying the funds directly to Carriage Court before closing he might be placing those funds at risk. The issue is thus not whether such an arrangement was permissible under the law; it is rather that in acting as Egudin's agent, Zehentner and Henderson had a duty to explain the potential consequences of the arrangement to him. The trial judge found as a matter of fact that they did not so explain, and concluded that this was a breach of their duty to him. We find neither manifest factual error, nor legal error on the trial judge's part in this regard.
For the foregoing reasons, the court rules that neither of appellees' two assignments of error have merit and the judgment of the trial court is hereby affirmed.
AFFIRMED.